UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RAIZY LEVY,

                Plaintiff,

    v.

CREDIT PLUS, INC., *et al.*,

                Defendants.

---

No. 21-CV-5541 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Elizabeth E. Apostola, Esq.
Daniel Zemel, Esq.
Zemel Law LLC
Patterson, NJ
*Counsel for Plaintiff*

Aaron Seong, Esq.
John A. Vogt, Esq.
Kerianne Tobitsch, Esq.
Meredith Christian, Esq.
Jones Day
New York, NY
*Counsel for Defendant Experian Information Solutions, Inc.*

KENNETH M. KARAS, United States District Judge:

      Plaintiff Raizy Levy ("Plaintiff") brings this putative class action against Experian

Information Solutions, Inc. ("Defendant") alleging a violation of the Fair Credit Reporting Act

("FCRA"), 15 U.S.C. § 1681, *et. seq.* (*See generally* Second Am. Compl. ("SAC") (Dkt. No.

73.).)[1]  Before the Court is Defendant's Motion to Compel Arbitration.  (*See* Not. of Mot. (Dkt.

No. 96).)  For the reasons stated below, the Motion is granted.

---

     [1] Plaintiff initially also brought suit against Credit Plus, Inc.; Equifax Information
Services, LLC; and Transunion, LLC (the "Dismissed Entities").  (*See* Not. of Removal Ex. B

## I. Background

### A. Factual Background

The following facts are taken from the Second Amended Complaint, (*see generally* SAC) and from the Declaration of David Williams that was submitted in support of Defendant's Motion to Compel, (*see* Decl. of David Williams ("Williams Decl.") ¶ 3 (Dkt. No. 99)).[2]

#### 1. Plaintiff's Allegations

Plaintiff was a Capital One credit card customer who became delinquent on her account. (SAC ¶ 7.)  In September 2019, Plaintiff settled her account with Capital One in full.  (*Id.* ¶ 8.) However, Defendant continued to report Plaintiff as having an outstanding obligation to Capital One, which hindered Plaintiff from receiving a loan because, on April 30, 2020, a creditor ran a Credit Plus report that showed the obligation.  (*Id.* ¶¶ 9–12.)  Plaintiff informed Credit Plus on April 20, 2020 and April 30, 2020 that the information in her report was false.  (*Id.* ¶ 13.) Plaintiff also disputed the report with Credit Plus but has not received the results of the investigation.  (*Id.* ¶ 14.)

---

("Compl.") 2 (Dkt. No. 1-2).)  The Parties have stipulated to the dismissal of Plaintiff's claims against all of these entities.  (*See* Dkt. Nos. 54, 62, 102.)  However, when discussing actions taken by any or all of the Dismissed Entities and Defendant prior to their dismissal, the Court refers to them collectively as "Defendants."

The Court cites to the ECF-stamped page number at the upper right-hand corner of all documents unless otherwise noted.

[2] As noted below, "[i]n deciding motions to compel [arbitration], courts apply a standard similar to that applicable for a motion for summary judgment . . . [, which] requires a court to consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (citations and quotation marks omitted); *see also Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) ("In the context of motions to compel arbitration . . ., the court applies a standard similar to that applicable for a motion for summary judgment.") (citations omitted).  Thus, the Court has reviewed all documents submitted by the Parties and includes only undisputed facts.

### 2.  Plaintiff's CreditWorks Account

CreditWorks is an online service operated by Experian Consumer Services ("ECS") that provides consumers access to their credit reports.  (Williams Decl. ¶ 3; *see also id.* at Ex. 1 (Dkt. No. 99-1).)  Defendant is an affiliate of ECS, as both entities are wholly-owned subsidiaries of Experian Holdings, Inc.  (*Id.* ¶ 2.)  Plaintiff signed up for a CreditWorks account on March 5, 2020.  (*Id.* ¶ 3.)  As a part of the account creation process, Plaintiff was required to click the "Create Your Account" button, and the following disclosure was included above the button: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement [the "2019 TOU"] . . . ."  (*Id.* ¶ 3, 5; *id.* at Ex. 1.)  The phrase "Terms of Use Agreement" in the disclosure was setoff in blue, bolded text and was a hyperlink that, if clicked, would have presented Plaintiff with the full text of the TOU.  (*Id.* ¶ 4.)

The 2019 TOU included an arbitration agreement that stated: "For purposes of this arbitration provision, references to "ECS,". . . shall include our . . . affiliates. . ."  (Williams Decl. Ex. 2 ("2019 TOU") at 4 (Dkt. No. 99-2).)  The CreditWorks TOU also included an amendments provision:

> This [TOU] may be updated from time to time. . . . Each time you order, access or use any of the Services or Websites, you signify your acceptance and agreement, without limitation or qualification, to be bound by the then current [TOU]. Modifications take effect as soon as they are posted to this Website . . . , delivered to you, or reasonably made available to you in writing by ECS.

(*Id.* at 3.)  A similar provision was included in the arbitration agreement that required Plaintiff to provide notice to ECS if she rejected any subsequent changes to the arbitration agreement.  (*Id.* at 5.)  Plaintiff has not provided notice to ECS that she "rejected any changes that were made" in the arbitration agreement.  (Williams Decl. ¶ 6.)

On May 5, 2022, CreditWorks amended its terms of use (the "2022 TOU").  (Williams Decl. ¶ 6; *see also* Williams Decl. Ex. 3 ("2022 TOU") 1 (Dkt. No. 99-5).)  Plaintiff accessed her

CreditWorks account after May 5, 2022.  (Williams Decl. ¶ 6.)  As relevant here, the 2022 TOU

added an additional statement that explained that "[f]or purposes of [the TOU], the terms 'we,'

'us' or 'ECS' refer to . . .[ECS and] . . . its . . . affiliates."  (2022 TOU at 2.)[3]

The arbitration agreement was also amended to provide as follows:

> ECS and you agree to arbitrate all disputes and claims between us arising out of or relating to [the TOU] to the maximum extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law. The agreement to arbitrate includes, but is not limited to: claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in . . . statute (including without limitation, the Credit Repair Organizations Act) . . . or any other legal theory; claims that arose before this or any prior [TOU] (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of [the TOU]. . . .
>
> The arbitration will be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and will be administered by the AAA. . . .
>
> All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the [TOU's] other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of [the TOU] including, but not limited to any claim that all or any part of this arbitration provision or [the TOU] is void or voidable.

(*Id.* at 9–10.)[4]

---

[3] Defendant is referenced as a possible source of credit reports or credit scores.  (*See* 2019 TOU at 2; 2022 TOU at 4.)

[4] The arbitration agreement also provides that "any arbitration under this agreement will take place on an individual basis; class arbitrations and class actions are not permitted" and that "you and ECS agree that each may bring claims against the other only in your or its individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding."  (2022 TOU at 9, 11.)

B.  Procedural History

This case was removed to this Court from New York Supreme Court, Rockland County on June 24, 2021.  (*See* Not. of Removal (Dkt. No. 1).)  Transunion, LLC filed its Answer on July 9, 2021.  (*See* Answer (Dkt. No 13).)  After requesting and receiving an extension (*see* Dkt. Nos. 10–11), Defendant filed its Answer on August 12, 2021, (*see* Answer (Dkt. No. 20)).  Plaintiff filed her First Amended Complaint on September 15, 2021.  (*See* First Am. Compl. (Dkt. No. 29).)  On September 16, 2021, Credit Plus, Inc. and Transunion, LLC filed their Answers.  (*See* Answer (Dkt. No. 30); Answer (Dkt. No. 31).)  On September 20, 2021, Defendant filed its Answer.  (*See* Answer (Dkt. No. 32).)  On September 24, 2021, Equifax Information Services, LLC filed its Answer.  (*See* Answer (Dkt. No. 33).)  The Parties submitted a case management plan on November 8, 2021.  (*See* Dkt. No. 40.)  After a conference on November 16, 2021 (*see* Dkt. (minute entry for November 16, 2021)), the Court approved the case management plan.  (*See* Dkt. Nos. 42–44.)

On January 6, 2022, Plaintiff filed a letter moving for leave of the Court to file a second amended complaint.  (*See* Letter from Daniel Zemel, Esq. to Court (January 6, 2022) (Dkt. No. 50).)  On January 10, 2022, the Parties stipulated to the dismissal with prejudice of Transunion, LLC.  (*See* Dkt. No. 54.)  On January 14, 2022, Defendant and Credit Plus, Inc. submitted a letter in opposition to Plaintiff's Motion to file a second amended complaint.  (*See* Letter from Aaron Seong, Esq. to Court (January 14, 2022) (Dkt. No. 55).)  On February 10, 2022, the Court held a conference to discuss Plaintiff's Motion to file a second amended complaint and ordered the Defendants to file a supplemental letter on the issue by February 22, 2022.  (*See* Dkt. (minute entry for February 10, 2022).)  On February 11, 2022, the Parties stipulated to the dismissal with prejudice of Equifax Information Services, LLC.  (*See* Dkt. No. 62.)  On February 22, 2022, Defendant and Credit Plus, Inc. filed their supplemental letter.  (*See* Letter from David M.

Gettings, Esq. to Court (February 22, 2022) (Dkt. No. 63).)  Plaintiff filed a reply on March 3, 2022. (*See* Pl's Reply (Dkt. No. 64).)  On April 1, 2022, the Parties jointly requested an extension of discovery deadlines, which the Court granted on April 4, 2022.  (*See* Dkt. Nos. 65–66.)  On April 4, 2022, the Court also granted Plaintiff's Motion to amend her complaint.  (*See* Order (Dkt. No. 67).)

On April 14, 2022, Defendant filed a letter requesting leave to file a motion to compel arbitration.  (*See* Letter from Kerianne Tobitsch, Esq. to Court (April 14, 2022) (Dkt. No. 70).)  On April 26, 2022, Plaintiff filed her Second Amended Complaint.  (*See* SAC.)  After requesting and receiving an extension (*see* Dkt. Nos. 71–72), Plaintiff responded to Defendant's letter requesting leave to file a motion to compel arbitration on April 20, 2022.  (*See* Letter from Daniel Zemel, Esq. to Court (April 27, 2022) (Dkt. No. 74).)  Defendant and Credit Plus, Inc. filed their Answers on May 10, 2022.  (*See* Answer (Dkt. No. 75); Answer (Dkt. No. 76).)  On May 15, 2022, Defendant filed a letter requesting to stay discovery until the Court determined whether to allow Defendant to file its proposed motion to compel arbitration.  (*See* Letter from Kerianne Tobitsch, Esq. to Court (May 15, 2022) (Dkt. No. 79).)  Plaintiff filed her response on May 19, 2022, (*see* Letter from Daniel Zemel, Esq. to Court (May 19, 2022) (Dkt. No. 83)), and the Court granted Defendant's request to stay discovery the same day, (*see* Order (Dkt. No. 84).)

On June 9, 2022, the Court held a conference and set a briefing schedule for Defendant's Motion To Compel Arbitration.  (*See* Dkt. (minute entry for June 9, 2022).)  Defendant filed its Motion To Compel Arbitration and accompanying papers on June 30, 2022.  (*See* Not. of Mot; Mem. of Law. In Supp. of Mot. To Compel Arbitration ("Def's Mem.") (Dkt. No. 97); Decl. of Kerianne Tobitsch, Esq. ("Tobitsch Decl.") (Dkt. No. 98); Williams Decl.)  On July 15, 2022, the Parties agreed to the dismissal of Credit Plus, Inc. with prejudice.  (*See* Dkt. No. 102.)  After

requesting and receiving an extension (*see* Dkt. Nos. 103–104), Plaintiff filed her Opposition,

(*see* Pl's Mem. of Law in Opp'n to Mot. To Compel Arbitration ("Pl's Opp'n") (Dkt. No. 105)).

After requesting and receiving leave to file excess pages, (*see* Dkt. Nos. 106–107), Defendant

filed its Reply on September 12, 2022, (*see* Def's Reply (Dkt. No. 108)).

## II.  Discussion

### A.  Standard of Review

The Federal Arbitration Act ("FAA") provides that an arbitration agreement "shall be

valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

revocation of any contract."  9 U.S.C. § 2.  The FAA "embodies the national policy favoring

arbitration and places arbitration agreements on equal footing with all other contracts."  *Buckeye

Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  However, "the FAA does not

require parties to arbitrate when they have not agreed to do so."  *Nicosia*, 834 F.3d at 229

(citation and quotation marks omitted); *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*,

475 U.S. 643, 648 (1986) ("[A]rbitration is a matter of contract and a party cannot be required to

submit to arbitration any dispute which he has not agreed so to submit." (citations omitted)).

In resolving a motion to compel arbitration, courts "appl[y] a standard similar to that

applicable for a motion for summary judgment."  *Bensadoun*, 316 F.3d at 175.  A court must

therefore "consider all relevant, admissible evidence submitted by the parties" and "draw all

reasonable inferences in favor of the non-moving party."  *Nicosia*, 834 F.3d at 229 (citation

omitted).  Under this standard, the Court evaluates "[a]llegations related to the question of

whether the parties formed a valid arbitration agreement . . . to determine whether they raise a

genuine issue of material fact."  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012).

"If there is a genuinely disputed factual issue whose resolution is essential to the determination

of the applicability of an arbitration provision, a trial as to that issue will be necessary. . . ."

*Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011); *see also* 9 U.S.C. § 4 ("If the making of the arbitration agreement . . . [is] in issue, the court shall proceed summarily to the trial thereof.").  However, "where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [a court] may rule on the basis of that legal issue and avoid the need for further court proceedings."  *Wachovia Bank*, 661 F.3d at 172 (citation and quotation marks omitted); *see also* 9 U.S.C. § 4 ("[U]pon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."); *Ryan v. JPMorgan Chase & Co.*, 924 F. Supp. 2d 559, 561–62 (S.D.N.Y. 2013) ("[A] [c]ourt must grant a motion to compel arbitration if the pleadings, discovery materials before the [c]ourt, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.").

B.  Analysis

    The Parties' dispute concerns a "[q]uestion[ ] of arbitrability," which is a "term of art covering 'disputes about whether the parties are bound by a given arbitration clause' as well as 'disagreements about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'"  *Pincaro v. Glassdoor, Inc.*, No. 16-CV-6870, 2017 WL 4046317, at *5 (S.D.N.Y. Sept. 12, 2017) (alterations omitted) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).  To answer this question, courts in the Second Circuit generally "follow a two-part test," whereby they consider "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement."  *In re Am. Express Fin. Advisors Secs. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299

(2010) (noting that a court "should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue" (emphasis omitted)).  "If federal statutory claims are alleged, the court must also assess whether Congress intended to exempt such claims from arbitration."  *Clookey v. Citibank, N.A.*, No. 14-CV-1318, 2015 WL 8484514, at *2 (N.D.N.Y. Dec. 9, 2015) (citing *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004)), *reconsideration denied*, 2016 WL 3365438 (N.D.N.Y. June 16, 2016).

### 1. Choice of Law

As an initial matter, the Court must decide which state's law governs the determination of whether a valid contract was formed between the Parties.  *See Long v. Amway Corp.*, 306 F. Supp. 3d 601, 607 (S.D.N.Y. 2018) ("Before enforcing an arbitration agreement, a court must decide whether the agreement is valid under state contract law." (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73–74 (2d Cir. 2017)).  Neither the 2019 TOU nor the 2022 TOU includes a choice-of-law provision.  (*See generally* 2019 TOU; 2022 TOU.)  Defendant has relied on New York law in its briefing on this issue.  (*See* Def's Mem. at 15.)  Plaintiff has relied primarily on California law.  (*See* Pl's Opp'n at 21 n.5.)

In making its determination, the Court will apply New York choice-of-law rules.  *See Follman v. World Fin. Network Nat'l Bank*, 721 F. Supp. 2d 158, 161 (E.D.N.Y. 2010) ("To determine which state's law to apply to the issue of contract formation, a federal court sitting with federal question jurisdiction looks to the choice-of-law doctrine of the forum state . . . .").  "[I]n the absence of a choice-of-law provision, New York applies a 'center of gravity' approach to contract cases[.]"  *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, No. 20-CV-5120, 2022 WL 1997207, at *15 (S.D.N.Y. June 6, 2022) (citation omitted).  "In adjudicating the choice of

law for a contract dispute, the New York Court of Appeals looks to 'five generally significant contacts': 'the place[s] of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties.'"  *United States v. Moseley*, 980 F.3d 9, 23 (2d Cir. 2020) (quoting *Matter of Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936, 940 (N.Y. 1993)).  "The traditional choice of law factors—the places of contracting and performance—are given heavy weight in this analysis."  *Id.* (citation omitted).

According to the SAC, Plaintiff "at all relevant times has resided in Spring Valley, New York."  (*See* SAC ¶ 4.)  Defendant has stated, and Plaintiff does not dispute, that Plaintiff received notice of a potential creditor's request for her credit report through CreditWorks on April 30, 2020 and obtained her credit report through CreditWorks the same day.  (*See* Williams Decl. ¶ 9.)  Plaintiff, in her Complaint, alleged that she was aware that her "information was provided to Credit Plus on . . . April 30, 2020;" the Court draws the inference that Plaintiff became aware of this disclosure of her information in Spring Valley, New York on April 30, 2020 through her CreditWorks account.  (*See* SAC ¶ 13.)  Defendant is an Ohio corporation, has its principal place of business in California, and is licensed to do business in New York, (*see* Answer ¶ 5 (Dkt. No. 75)); ECS, which operates CreditWorks, also does business in California, (*see* Williams Decl. ¶ 1.  The Court finds that, on the record before it, New York law should apply to this dispute, as Plaintiff was a New York resident at all relevant times, used CreditWorks in New York, and became aware of one of the alleged FCRA violations that serves as the basis for her suit in New York.  *See Kassim v. CVS Albany, LLC*, No. 21-CV-2927, 2022 WL 4357456, at *7 (E.D.N.Y. Sept. 20, 2022) (finding New York law governed where plaintiff was "a resident of New York, and for both relevant periods of his employment [in dispute] . . .was located in New York."); *Fontaine v. Resurgent Cap. Servs., L.P.*, 540 F. Supp. 3d 353, 357

(W.D.N.Y. 2021)  (finding New York law applied in part because the "[p]laintiff live[d] in and used his credit card in New York").

### 2. Valid Agreement to Arbitrate

"Whether one can be bound by an arbitration clause is usually determined by looking at generally accepted principles of contract law." *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (collecting cases).  Pursuant to these principles, "a party is bound by the provisions of a contract that he signs, unless he can show special circumstances that would relieve him of such an obligation." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir. 1987), *abrogated on other grounds by Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991); *see also Cap Gemini Ernst & Young U.S. LLC v. Arentowicz*, No. 04-CV-299, 2004 WL 1386145, at *5 (S.D.N.Y. June 22, 2004) ("An individual who signs a contract is presumed to know its contents and assent to them, unless he can show special circumstances, such as duress or coercion, which would justify non-enforcement of the contract." (citation and quotation marks omitted)).  In the context of evaluating whether "special circumstances" sufficient to warrant relief from an arbitration agreement exist, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000).  "[T]he party seeking to compel arbitration has the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate." *Biggs v. Midland Credit Mgmt., Inc.*, No. 17-CV-340, 2018 WL 1225539, at *8 (E.D.N.Y. Mar. 9, 2018) (citation omitted); *Ferro v. Allied Interstate, LLC*, No. 19-CV-49, 2019 WL 3021234, at * 2 (E.D.N.Y. July 10, 2019) ("The moving party has the initial burden of showing that an agreement to arbitrate exists." (alteration and citation omitted)).  "Whether the [P]arties agreed to arbitrate is determined by state contract law." *Kurz v. Chase*

11

*Manhattan Bank USA, N.A.*, 319 F. Supp. 2d 457, 461 (S.D.N.Y. 2004) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

Plaintiff and Defendant differ on whether Defendant is, in fact, a party to the arbitration agreement contained in either the 2019 TOU or 2022 TOU.  Defendant argues that it is a party to the agreement because ECS is defined to include ECS's "affiliates."  (Def's Mem. at 17.) Plaintiff argues that Defendant cannot be a party to the agreement because Defendant and ECS are separate entities and Defendant is not explicitly referenced anywhere in the agreement.  (Pl's Opp'n at 20–21.)

In both versions of the arbitration agreement, ECS is defined to include, among other entities, its affiliates.  (*See* 2019 TOU at 4; 2022 TOU at 9.)  Both versions of the TOU also state specifically that Defendant may be a source of credit scores for ECS, which taken together with the fact that the entities both include the name "Experian" supports the inference that they are affiliates.  (*See* 2019 TOU at 2; 2022 TOU at 4.)  Finally, Defendant has also provided a sworn affidavit from David Williams, a Vice President at ECS, who states that Defendant is an affiliate of ECS and that both entities share a common parent.  (*See* Williams Decl. ¶ 2.)  The Court finds this evidence sufficient to establish that Defendant is an affiliate of ECS and thus a party to the contract.  Other courts that have reviewed the 2019 TOU have reached the same conclusion. *See, e.g., Morgan v. Experian Info. Sols., Inc.*, No. 21-CV-5783, 2022 WL 681359, at *1 (W.D. Wash. Mar. 4, 2022) ("It is undisputed that the [2019] TOU applies to ECS affiliates and Plaintiff offers no cogent argument why ESI should not be considered one."); *Roberson v. Experian Info. Sols., Inc.*, No. 21-CV-316, 2022 WL 62270, at *4 (W.D. Tex. Jan. 5, 2022) ("Plaintiff agreed to arbitrate its claims against ECS, as well as its parent entities, subsidiaries, and affiliates.  It is undisputed that ECS is an affiliate of Experian."); *see also Meeks v. Experian*

*Info. Servs., Inc.*, Nos. 21-17023, 22-15028, 2022 WL 17958634, at *2 (memorandum) (9th Cir.

Dec. 27, 2022) (holding Defendant was a party to the arbitration agreement contained in the

2019 TOU and explaining that the fact that "[Defendant] was an affiliate at the time the contract

was formed and that it play[ed] a role in the larger agreement provide . . . evidence that it

assented to be bound" by the arbitration agreement).[5]  Courts interpreting similar language in

other agreements have also reached the same conclusion.  *See, e.g., George v. Rushmore Serv.*

*Ctr., LLC*, No. 18-CV-13698, 2020 WL 2319293, at *2 (D.N.J. May 11, 2020) (finding

defendant could directly enforce arbitration agreement because agreement defined the party in

question to include its "affiliates [and] agents" and defendant was an agent of an affiliate of the

party); *Richert v. Nat'l Arb. F., LLC*, No. 09-CV-763, 2009 WL 3297565, at *2 (D. Minn. Oct.

13, 2009) (finding defendants, as agents or affiliates of a party to the arbitration provision, could

directly enforce the arbitration provision because it "cover[ed] any dispute between the [party]

and Employee or claim by either against the other or *any agent or affiliate of the other*"

(emphasis in original)); *cf. Lucy v. Bay Area Credit SVC LLC*, 792 F. Supp. 2d 320, 326 (D.

Conn. 2011) (holding, where an "arbitration clause allow[ed] [a party's] 'subsidiaries, affiliates,

agents, employees, predecessors in interest, successor, and assigns' to compel arbitration," that a

---

[5] Plaintiff points to the *Meeks v. Experian Info. Sols., Inc.*, No. 21-CV-3266, 2021 WL
5149066 (N.D. Cal. Aug. 31, 2021), where the district court determined in reviewing the 2019
TOU that Defendant could not directly enforce the agreement because, while Defendant was a
party to the arbitration agreement, Defendant was not a party to the entirety of the 2019 TOU.
*Id.* at *2.  The *Meeks* court suggested, in dicta, that Defendant might be a third-party beneficiary,
but noted that Defendant had failed to raise that argument in its briefing.  *Id.*
    The Ninth Circuit has since issued an opinion reversing the district court in *Meeks*,
holding that Defendant was a party to the arbitration agreement because the arbitration
agreement is severable from the 2019 TOU and the arbitration agreement specifically defines
ECS to include affiliates such as Defendant.  *See Meeks*, 2022 WL 17958634, at *2–3.

defendant who did not fall into any of the categories in the arbitration agreement could not compel plaintiff to arbitrate her dispute).

Thus, the Court agrees with Defendant that it is an affiliate of ECS and a party to the contract.[6]

The next question is whether a valid agreement to arbitrate was formed between Plaintiff and Defendant.  Defendant argues that a valid agreement to arbitrate exists because Plaintiff indicated her assent to the terms of the agreement when she created her account.  (Def's Mem. 15–16.)  Plaintiff does not appear to dispute that a valid agreement to arbitrate exists, only whether Defendant is a party to that agreement.  (Pl's Opp'n 19–25.)

When reviewing agreements to arbitrate entered into over the internet, the Second Circuit has explained that the relevant inquiries are whether "the notice of the arbitration provision was reasonably conspicuous and manifestation of assent unambiguous as a matter of law." *Meyer*, 868 F.3d at 76 (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 28 (2d Cir. 2002)).[7]  In determining whether notice was reasonably conspicuous, the Court must take the "perspective of a reasonably prudent [computer] user." *Id.* at 77 (citing *Schnabel*, 697 F.3d at 124).

Here, Plaintiff, when creating her account, was provided the following disclosure set off in blue, bolded text immediately above the "Create Your Account" button: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement . . . ." (Williams Decl. ¶ 3,

---

[6] Because the Court has found that Defendant may enforce the arbitration agreement directly, it will not address the Parties' arguments concerning whether Defendant is a third-party beneficiary of either the 2019 or 2022 TOU.  (*See* Def's Mem. 19–24; Pl's Opp'n 22–25.)

[7] Although *Meyer* applied California, and not New York, contract law, the Second Circuit specifically noted that "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'"  868 F.3d at 74 (citing *Schnabel*, 697 F.3d at 119).

5, *see also id.* Ex. 1.)  It is undisputed that the phrase "Terms of Use Agreement" in the disclosure was a hyperlink that, if clicked, would have presented Plaintiff with the full text of the 2019 TOU, including the arbitration agreement.  (*Id.* ¶ 4.)  The Second Circuit held in *Meyer* that a materially similar account creation page in the Uber smartphone application, where the page included a "Register" button and a hyperlinked notification immediately below that "By creating an Uber account you agree to the Terms of Service & Privacy Policy," provided reasonably conspicuous notice.  868 F.3d at 78; *see also Hamm v. Capsule Corp.*, No. 22-CV-5435, 2022 WL 4468028, at *3 (S.D.N.Y. Sept. 26, 2022) (finding reasonably conspicuous notice was provided where the account creation page at issue was "in almost every relevant respect[] identical to *Meyer*").  The Court sees no reason to depart from the holding in *Meyer* here and finds that Plaintiff was provided with reasonably conspicuous notice of the arbitration agreement in the 2019 TOU.

To determine whether a valid agreement was formed, the Court must also consider whether Plaintiff unambiguously manifested her "assent to arbitration."  *Meyer*, 868 F.3d at 79. Here, as in *Meyer*, the close proximity between the notice of the 2019 TOU and the "Create Your Account" button would make clear to "[a] reasonable user . . . that by clicking the registration button, [she] was agreeing to the terms and conditions accessible via the hyperlink, whether [she] clicked on the hyperlink or not."  *Id.* at 79–80.  Thus, Plaintiff's clicking the button to create her CreditWorks account unambiguously manifested her assent to the arbitration agreement in the 2019 TOU.  *See id.* at 79–80.

The Court finds that Defendant has established by a preponderance of the evidence that a valid agreement to arbitrate exists.

### 3.  Scope of the Arbitration Agreement

Defendant argues that any questions concerning whether Plaintiff's claims fall within the scope of the arbitration provision are for an arbitrator to decide because the Parties have agreed that an arbitrator should decide the validity and applicability of the provision.  (*See* Def's Mem. at 24–26.)  Plaintiff argues that his claims do not arise from the agreement and thus are not within the scope of the arbitration provision.  (*See* Pl's Opp'n at 25–31.)

 "Under the FAA, as interpreted by the Supreme Court, the general presumption is that the issue of arbitrability should be resolved by the courts."  *Bar-Ayal v. Time Warner Cable Inc.*, No. 03-CV-9905, 2006 WL 2990032, at *5 (S.D.N.Y. Oct. 16, 2006) (citation omitted).  However, "[p]arties to an arbitration agreement can. . . 'agree to arbitrate gateway questions of arbitrability.'"  *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) (quotation marks omitted)).  Such questions include "whether the arbitration agreement applies to a particular dispute."  *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021).  "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so."  *Id.* at 317 (alterations, citations, and quotation marks omitted); *see also NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014) (noting that the party seeking to compel arbitration of arbitrability bears the burden of establishing "clear and unmistakable expression of the parties' intent to submit arbitrability disputes to arbitration").

In determining the parties' intent, "the arbitration agreement is determinative."  *DDK Hotels*, 6 F.4th at 318 (citing *First Options of Chi.*, 514 U.S. at 943).  When "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."  *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005).  Similarly,

"[b]road language expressing an intention to arbitrate all aspects of all disputes supports the inference of an intention to arbitrate arbitrability[.]"  *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019).

> The arbitration agreement in the 2022 TOU, in relevant part, provides:
>
> ECS and you agree to arbitrate all disputes and claims between us arising out of or relating to [the TOU] to the maximum extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law. The agreement to arbitrate includes, but is not limited to: claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in . . . statute (including without limitation, the Credit Repair Organizations Act) . . . or any other legal theory; claims that arose before this or any prior [TOU] (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of [the TOU]. . . .
>
> The arbitration will be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and will be administered by the AAA. . . .
>
> All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the [TOU's] other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of [the TOU] including, but not limited to any claim that all or any part of this arbitration provision or [the TOU] is void or voidable.

(2022 TOU at 9–10.)[8]  The Court finds that these provisions include the hallmarks that the Second Circuit has identified as indicating that the clear and unmistakable intent of the Parties to submit arbitrability determinations to the arbitrator.

---

[8] Defendant has argued that the terms of the arbitration agreement in the 2022 TOU should govern this dispute.  (*See* Def's Mem. at 25.)  Plaintiff appears to concede this point.  (*See* Pl's Opp'n at 27.)

First, the arbitration provision incorporates, by reference, the Commercial Arbitration

Rules of the American Arbitration Association ("AAA Rules"), which provide in relevant part

that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any

objections with respect to the existence, scope or validity of the arbitration agreement, or to the

arbitrability of any claim[.]"  *See* American Arbitration Association*, Commercial Arbitration

Rules and Mediation Procedures* ("AAA Rules") R-7(a) (September 1, 2022),

https://www.adr.org/sites/default/files/Commercial_Rules-Web.pdf; *see also Contec,* 398 F.3d at

208 (noting that arbitration agreement cited to AAA Rule R–7(a) and explaining that "when, as

here, parties explicitly incorporate rules that empower an arbitrator to decide issues of

arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to

delegate such issues to an arbitrator"); *Bar-Ayal*, 2006 WL 2990032, at *8 (finding that parties'

incorporation of AAA Commercial Arbitration Rules in arbitration provision was "sufficiently

clear and unmistakable evidence that the parties intended to have issues of arbitrability decided

by the arbitrator").

Second, the arbitration provision states that the Parties "agree to arbitrate all disputes and

claims between us arising out of or relating to [the TOU] to the maximum extent permitted by

law."  (2022 TOU at 9.)  The agreement also explicitly provides that "[a]ll issues are for the

arbitrator to decide, including the scope and enforceability of this arbitration provision as well as

the [TOU's] other terms and conditions, and the arbitrator shall have exclusive authority to

---

The Court agrees that the 2022 TOU should govern this dispute because the 2019 TOU
provision concerning amendments stated that "[e]ach time you order, access or use any of the
Services or Websites, you signify your acceptance and agreement, without limitation or
qualification, to be bound by the then current Agreement."  (*Id.* at 3.)  It is undisputed that
Plaintiff accessed CreditWorks after May 5, 2022, the date the 2022 TOU took effect.  (Williams
Decl. ¶ 6.)  The plain terms of the contract dictate that her use of CreditWorks after that date is
sufficient to establish her assent to the 2022 TOU.

resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of [the TOU] including, but not limited to any claim that all or any part of this arbitration provision or [the TOU] is void or voidable." (*Id.*) Other courts across the country reviewing earlier versions of the TOU, including the 2019 TOU and other materially similar versions, have found that this language provides clear and unmistakable evidence that the Parties intended to submit all arbitrability issues to the arbitrator. *See, e.g., Solis v. Experian Info. Sols., Inc.*, No. 22-CV-102, 2022 WL 4376077, at *2 (C.D. Cal. Sept. 21, 2022) (finding that the 2019 TOU made "clear that the arbitrator decides 'scope' issues—i.e., which claims are subject to the agreement"); *Stephens v. Experian Info. Sols., Inc.*, —F. Supp. 3d—, 2022 WL 2716177, at *6 (D. Haw. July 13, 2022) ("[T]his court concludes that the parties have clearly and unmistakably delegated the issue of arbitrability to the arbitrator."); *Roberson v. Experian Info. Sols., Inc.*, No. 21-CV-316, 2022 WL 62270, at *4 (W.D. Tex. Jan. 5, 2022) (holding that "[t]his provision constitutes a valid delegation clause delegating all questions regarding the arbitrability of the specific claims at issue to the arbitrator"); *Coulter v. Experian Info. Sols., Inc.*, No. 20-CV-1814, 2021 WL 735726, at *4 (E.D. Pa. Feb. 25, 2021) (holding that the "[arbitration] provision constitutes a clear and unmistakable delegation clause . . . and delegates the exclusive authority to resolve 'all issues' to the arbitrator, including . . . 'scope and enforceability'"). Courts in the Second Circuit have interpreted materially similar language in other arbitration agreements as clear and unmistakable evidence of the parties' intent to arbitrate arbitrability. *See, e.g., Citigroup Inc. v. Sayeg Seade*, No. 21-CV-10413, 2022 WL 179203, at *6 (S.D.N.Y. Jan. 20, 2022) (finding that provisions "requiring arbitration for 'any dispute regarding the applicability or not applicability of the benefit' and '[a]ny disputes related to the Awards'" were clear and unmistakable evidence); *Al Thani v. Hanke*, No. 20-CV-4765, 2021 WL 4311391, at *5

(S.D.N.Y. Sept. 21, 2021) (determining that arbitration provision which provided that "[a]ny controversy or claim arising out of or relating to this Agreement to which Escrow Agent is a party" was subject to arbitration was clear and unmistakable evidence). Thus, the Court finds that the Parties clearly and unmistakably intended to submit the threshold issue of whether this dispute is covered by the arbitration agreement included in the 2022 TOU to an arbitrator.[9]

### 4. Waiver

Plaintiff argues that Defendant has waived its right to compel arbitration by its litigation conduct. (*See* Pl's Opp'n 11–19.) Not surprisingly, Defendant disagrees. (*See* Def's Reply 18–21.)[10]

Courts maintain a "strong presumption in favor of arbitration," and, accordingly, waiver "is not to be lightly inferred," *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 104–05 (2d Cir. 2002) (citation and quotation marks omitted), and any doubts "are resolved in favor of arbitration," *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir.

---

[9] Although the Parties had not addressed the issue, the Court notes that the class action waiver included in the 2022 TOU is enforceable and requires that Plaintiff proceed on an individual basis in arbitration. *See*, *e.g.*, *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 58–59 (E.D.N.Y. 2017) (surveying relevant case law and finding class action waiver enforceable).

[10] In its Reply, Defendant has also suggested that the issue of waiver by litigation conduct is for the arbitrator to decide. (*See* Def's Reply 18–19.) However, "[t]he Second Circuit [has] not . . . squarely addressed the question of whether litigation-conduct waiver is an issue to be decided by an arbitrator when the parties have agreed to have the arbitrator decide questions of arbitrability." *LG Elecs., Inc. v. Wi-LAN USA, Inc.*, No. 13-CV-2237, 2014 WL 3610796, at *3 n.3 (S.D.N.Y. July 21, 2014) (declining to address the question of who should decide waiver when the issue "ha[d] not been adequately raised" and proceeding to decide waiver), *aff'd*, 623 F. App'x 568 (summary order) (2d Cir. 2015); *see also Pierre v. Rochdale Vill. Inc.*, No. 18-CV-6383, 2020 WL 6799635, at *6 (E.D.N.Y. Nov. 19, 2020) (reviewing caselaw on whether waiver by litigation conduct is a question for courts or arbitrators). Thus, the Court declines to address this argument because the Second Circuit has made clear that "'[w]hen the party seeking arbitration has participated in litigation regarding the dispute, the district court can properly decide the question of waiver." *Meyer*, 159 F.3d at 80–81 (citing *Bell v. Cendant Corp.*, 293 F.3d 563, 569 (2d Cir. 2002)).

1995).  In determining whether a party has, through its litigation conduct, waived a contractual

right to arbitration, courts in the Second Circuit have traditionally considered: "(1) the time

elapsed from when litigation was commenced until the request for arbitration; (2) the amount of

litigation to date, including motion practice and discovery; and (3) proof of prejudice."  *La.*

*Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 626 F.3d 156, 159

(2d Cir. 2010) (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d

218, 229 (2d Cir. 2001)).  However, the Supreme Court recently issued a unanimous opinion that

waiver in the arbitration context does not require a finding of prejudice, so a party arguing

waiver is no longer required to demonstrate it.  *See Morgan v. Sundance, Inc.*, 142 S. Ct. 1708,

1714 (2022).[11]  Thus, the Court will consider "whether Defendant[] 'knowingly relinquish[ed]

the right to arbitrate by acting inconsistently with that right' by considering the time elapsed and

the amount of litigation to date."  *De Jesus*, 2022 WL 3097883, at *7 (second alteration in

original) (quoting *Morgan*, 142 S.Ct. at 1712).

### a.  Time Elapsed

"[D]elay alone does not establish waiver."  *Murray v. UBS Sec., LLC*, No. 12-CV-5914,

2014 WL 285093, at *4 (S.D.N.Y. Jan. 27, 2014) (citing *PPG Indus., Inc. v. Webster Auto Parts,*

---

[11] As discussed in *Herrera v. Manna 2nd Ave. LLC*, No. 20-CV-11026, 2022 WL
2819072 (S.D.N.Y. July 18, 2022), the exact impact of *Morgan* on the review of waiver by
litigation conduct in the Second Circuit is uncertain, as it is unclear "whether *Morgan* instructs
courts to adopt general waiver analysis, or instead instructs courts to strip any prejudice
requirement from their existing analysis of waivers of the right to arbitration under the FAA."
*Id.* at *8 (applying both general waiver and waiver by litigation conduct analyses).  However, the
Court finds that, in the absence of guidance from the Second Circuit, *Morgan* does not clearly
require this Court to apply a general waiver analysis instead of the now-truncated test for waiver
by litigation conduct that applies in the context of the FAA.  *See De Jesus v. Gregorys Coffee
Mgmt., LLC*, No. 20-CV-6305, 2022 WL 3097883, at *7 (E.D.N.Y. Aug. 4, 2022) (explaining
that "the Second Circuit has not ruled on whether a new standard applies to motions to compel
arbitration" and applying "the other two elements [of the litigation conduct waiver analysis]
traditionally used by the Second Circuit").

*Inc.*, 128 F.3d 103, 108 (2d Cir. 1997)); *see also Chehebar v. Oak Fin. Grp., Inc.*, No. 14-CV-2982, 2017 WL 946292, at *3 (E.D.N.Y. Mar. 7, 2017) (collecting cases finding no waiver despite delays from four months to three years).

Here, nine months elapsed from the commencement of this litigation to Defendant filing its letter requesting to file its Motion to Compel Arbitration.  (*See generally* Dkt.)  This relatively short period between the removal of this case and Defendant's request to file a Motion to Compel does not weigh in favor of finding waiver.  *See In re Generali Covid-19 Travel Ins. Litig.*, 577 F. Supp. 3d 284, 294 (S.D.N.Y. 2021) ("Courts have found delays longer than a year . . . not to constitute waiver."); *Besara v. Høm*, No. 20-CV-3862, 2021 WL 2703351, at *4 (E.D.N.Y. July 1, 2021) ("Here, [the defendants] waited more than seven months to file a motion to compel arbitration, but '[i]t is beyond question that defendants' delay in seeking arbitration during approximately eight months of pretrial proceedings is insufficient by itself to constitute a waiver of the right to arbitrate.'" (quoting *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir. 1985))).

### b.  Amount of Litigation

When analyzing the amount of litigation that has occurred, the Court considers primarily "any motion practice engaged in by the parties and the extent of discovery that the parties have exchanged."  *De Jesus*, 2022 WL 3097883, at *9 (citing, inter alia, *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 83 (2d Cir. 1998) (observing that the waiver analysis includes consideration of "the amount of litigation (including exchanges of pleadings, any substantive motions, and discovery)")).  "While not pleading arbitration in the answer can be used as evidence towards finding of waiver, there is no per se rule that arbitration must be pleaded in the answer in order to avoid waiver." *Thyssen*, 310 F.3d at 105–06 (2d Cir. 2002) (citation omitted).

During the period this case has been pending, there has been no dispositive motion practice, (*see generally* Dkt.), and while there is a case management plan and the Parties began discovery, it is undisputed that fewer than two hundred pages of documents have been exchanged, (*see* Tobitsch Decl. ¶ 6). Most of the discovery was exchanged prior to Plaintiff requesting leave to file the SAC and add class allegations. (*See id*.) Defendant did not raise arbitration as an affirmative defense until its Answer to the SAC. (Answer at 13 (Dkt. No. 75).)

Taken together, the amount of litigation to date in this case also does not support a finding that Defendant has waived its right to compel arbitration because it is undisputed that there has been no dispositive motion practice and very little discovery exchanged. *See Herrera*, 2022 WL 2819072, at *10 (finding no waiver where parties had yet "to brief the merits of their dispute" and there was a "lack of any meaningful discovery"); *De Jesus*, 2022 WL 3097883, at *9 (finding no waiver where parties had not engaged in substantive motion practice, even though the court had "accept[ed] [p]laintiff's arguments that the parties have exchanged considerable discovery"). While Plaintiff suggests that Defendant's failure to plead arbitration as an affirmative defense until its Answer to the SAC should be taken into account, (*see* Pl's Opp'n at 18), the Court is uncertain it is relevant, particularly because Defendant has actually raised the affirmative defense, which would seem to instead support a finding that no waiver has occurred. *Cf. Thyssen*, 310 F.3d at 105–06 (explaining that failure to raise arbitration as affirmative defense is not, in and of itself, necessary to avoid waiver).

Thus, the Court finds that Defendant has not waived its right to compel arbitration.

## III.  Conclusion

Because the Court has determined that the arbitration agreement is valid, the claims before it are arbitrable, and Defendant has not waived its right to compel arbitration, the Court will stay further judicial proceedings, as Defendant has requested, (*see* Def's Mem. at 26), and

order the Parties to arbitrate, *see Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) ("[T]he text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested.").  Accordingly, this matter is stayed pending the completion of arbitration.  The Clerk of Court is respectfully directed to terminate the pending Motion.  (*See* Dkt. No. 96.)

SO ORDERED.

 Dated:   March 27, 2023
              White Plains, New York

_____
              KENNETH M. KARAS
              United States District Judge